UNITED STATES BANKRUPTCY COURT
DISTRICT OF NORTH DAKOTA

In re:                                                          Bankruptcy No. 03-32020
                                                                Chapter 7
Kelly Glatt,

                Debtor.
_____/

Legendary Loan Link, LLP,                                       Adversary No. 04-7009
n/k/a Legendary Loan Link, Inc.,

                Plaintiff,

      vs.

Kelly Glatt,

                Defendant.
_____/

**MEMORANDUM AND ORDER**

By Complaint filed February 9, 2004, Plaintiff Legendary Loan Link, LLP initiated this adversary proceeding seeking determinations that Debtor/Defendant Kelly Glatt is not entitled to a discharge pursuant to 11 U.S.C. § 727(a)(2) and (5) and that an outstanding debt owed by the Debtor to Legendary Loan Link in the amount of $8,659.64 is nondischargeable pursuant to 11 U.S.C. § 523(a)(2), (4) and (6). By Answer filed March 8, 2004, the Debtor denies the allegations.

The matter was tried before the Court on May 26, 2004. Another adversary proceeding initiated in this bankruptcy case, Legendary Leasing, Inc. vs. Glatt, Adversary No. 04-7008,

AO 72A
(Rev.8/82)

involves similar facts and issues, and was tried at the same time.[1] The following constitutes the Court's findings of fact and conclusions of law:

## I. FINDINGS OF FACT

The Debtor is 22 years old. He did not graduate from high school, but has a high school equivalency degree. In January 2002, he leased a 260-acre ranch and started a horse training and shoeing business.

Roger Jahner, who was doing business with the Debtor, introduced the Debtor to Jahner's friend, Delmar A. Sukut. Sukut engages in custom haying and harvesting during the summer and drives truck and leases cattle and machinery during the winter. The Debtor asked Sukut to finance his purchase of horses after applying to banks for loans without success. Sukut agreed and bought several horses for the Debtor. The Debtor and Sukut signed an invoice on April 17, 2002, indicating Sukut purchased six horses for the Debtor in the total amount of $5,000.00, and the Debtor received a $2,000.00 cash advance from Sukut. According to Sukut's deposition testimony, he and the Debtor did not have an agreement as to a payment schedule for the debt, but they were going to put together a security agreement and payment schedule as soon as they were done buying horses.

Sukut stated he was unaccustomed to this type of transaction because he typically deals only in cattle, so he contacted Bill Thovson for assistance in May 2002. Thovson and Sukut had worked together in 1996 or 1997, and they were reintroduced in 2002 through Jahner, a client of Thovson.

---

[1] A separate Order will be entered in Legendary Leasing, Inc. vs. Glatt, Adv. No. 04-7008.

2

Thovson is the founder and 90% owner of Legendary Loan Link, the plaintiff in this case, and the founder and full owner of Legendary Leasing, Inc. Sukut told Thovson he loaned the Debtor money and was interested in having Thovson prepare the paperwork to secure the transactions. Thovson and Sukut also discussed Thovson purchasing the loan from Sukut, and Thovson drafted the appropriate documents accordingly. Sukut paid Thovson $200.00 for this service and signed an assignment of his right to receive payment from the Debtor to Thovson.

The Debtor had previously sought lease arrangements with Thovson that Thovson refused. After the launch of his business, the Debtor again approached Thovson seeking to lease a stock trailer, fencing panels and gates for use in his horse operation. Thovson learned that Jahner sublet a trailer to the Debtor and that the Debtor made payments regularly. Based on Jahner's experience with the Debtor, Thovson determined the Debtor had demonstrated his ability to make prompt payments, and he decided to lease the trailer, fencing panels and gates to the Debtor.

On July 19, 2002, the Debtor drove to Fargo, North Dakota to meet with Thovson regarding the lease agreement. The Debtor testified he arrived prepared to sign the lease agreement, but Thovson informed him he had to sign the loan documents Thovson prepared at Sukut's request before Thovson would lease to the Debtor. According to Thovson, he needed consideration for the lease transaction, so he required the Debtor sign the loan documents to get the lease.

The Debtor signed a $7,000.00 promissory note payable to Thovson in annual installments and a security agreement providing that collateral for the loan is all chattel, particularly the Debtor's horse inventory. He also signed a financing statement filed with the North Dakota Secretary of State and a disclosure statement and letter of understanding. Thovson testified that

3

AO 72A
(Rev.8/82)

the disclosure statement and letter of understanding is a compliance document satisfying the requirements of the North Dakota Banking Commission, including certain information on loans, such as the initial loan amount, the Debtor's agreement to maintain $7,000.00 in horse inventory, and the fact that the transaction is tied to the lease transaction and serves as consideration for it. Thovson testified that because it was his first transaction with the Debtor, he spent a lot of time ensuring the Debtor understood the structure and nature of the loan. Thovson went through each document and gave the Debtor copies of all the documents. When Thovson contacted Sukut to issue him a check for the assignment of his right to receive payment from the Debtor, Sukut and Thovson instead agreed that Thovson would receive "a couple hundred bucks" from each annual payment collected from the Debtor by Thovson. Thovson conceded that he should have redrafted the documents covering the loan transaction such that the promissory note would have been in Sukut's name, but he did not.

The Debtor testified he was in financial trouble on July 19, 2002, the date he met with Thovson and signed the loan documents — he had $500.00 and one horse to his name. He had owned more horses earlier, but he sold them and used the proceeds to continue operating his business. He testified he did not acquire any other horses of his own after July 19, 2002. Notwithstanding, at Thovson's request, the Debtor provided a list of his horse inventory in May 2003, including six horses valued at a total of $4,550.00. The Debtor testified he had these horses in May 2003, and the document includes the statement by the Debtor, "This is what I had around as of 5-15-03."

4

AO 72A
(Rev.8/82)

The Debtor did not make any payments to either Sukut or Thovson on the loan. Thovson conceded he did not administer the loan as closely as he should have, and he ultimately payed Sukut $7,000.00 to maintain their business relationship.

On December 31, 2002, the Debtor lost his lease of the real property, and he had to be off the property by January 2003. The Debtor testified he expected he would get a job and keep shoeing to keep his horse business operating.

The Debtor filed a voluntary Chapter 7 petition for bankruptcy relief on November 13, 2003.

## II. CONCLUSIONS OF LAW

Legendary Loan Link argues both for the denial of a bankruptcy discharge to the Debtor and for a determination of nondischargeability of the obligation owed on the promissory note to Legendary Loan Link by the Debtor.

A.  11 U.S.C. § 727(a)

Legendary Loan Link seeks to have the Debtor denied a discharge under 11 U.S.C. § 727(a)(2), and (a)(5). Section 727(a) provides in relevant part:

(a) The court shall grant the debtor a discharge, unless—

\* \* \*

    (2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—

        (A) property of the debtor, within one year before the date of the filing of the petition; or

5

> (B) property of the estate, after the date of the filing of the petition;
>
> * * *
>
> (5) the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities[.]

11 U.S.C. § 727(a).

Denying a debtor a discharge is a drastic remedy. See In re McLaren, 236 B.R. 882, 893 (Bankr. D.N.D. 1999). In light of the policy implications favoring debtors under the Bankruptcy Code, section 727 must be construed liberally in favor of the debtor and strictly against the objecting party, with the burden of proof thereunder resting squarely upon the latter. See id. The standard of proof is a preponderance of the evidence. See id.

1. Section 727(a)(2)(A)

Legendary Loan Link argues the Debtor should be denied a discharge pursuant to 11 U.S.C. § 727(a)(2) because the Debtor intended to hinder, delay, or defraud Legendary Loan Link by selling the horses collateralizing the loan in violation of the security agreement and letter.

The elements essential to barring a discharge under section 727(a)(2)(A) are:

> (1) that the act complained of was done within one year prior to the date of petition filing; (2) the act was that of the debtor; (3) it consisted of a transfer, removal, destruction or concealment of the debtor's property; and (4) it was done with an intent to hinder, delay or defraud either a creditor or an officer of the estate.

Kaler v. Craig (In re Craig), 195 B.R. 443, 449 (Bankr. D.N.D. 1996).

First, Legendary Loan Link failed to establish that the Debtor sold the horses within one year prior to the date of the petition filing. The Debtor filed his voluntary Chapter 7 petition

6

AO 72A
(Rev.8/82)

on November 13, 2003. On April 17, 2002, Sukut and the Debtor signed an invoice memorializing Sukut's purchase of six horses for the Debtor. The Debtor testified that on July 19, 2002, he had one horse, and that he did not acquire any other horses of his own after July 19, 2002. He stated he sold the other horses and used the proceeds to continue operating his business. The evidence before the Court does not shed any light on whether the Debtor sold his remaining horse, and if so, when he sold it. Also remaining unexplained is why the Debtor gave Thovson a list of his horse inventory in May 2003 including six horses valued at a total of $4,550.00 if he indeed sold five of the horses Sukut bought for him and did not acquire any other horses of his own after July 19, 2002. The Debtor testified he "had" the horses listed on the inventory statement in May 2003, and the Debtor noted on the inventory statement, "This is what I *had around* as of 5-15-03." No other evidence supports a finding that he owned the horses he "had around," much less that he sold them. Without further illumination, the Court must conclude the preponderance of the evidence supports a conclusion that Legendary Loan Link failed to prove the Debtor sold any horse within one year of his bankruptcy petition.

Moreover, even had the Debtor sold any horses within one year of the filing of his bankruptcy petition, Legendary Loan Link failed to prove the Debtor sold the horses with an intent to hinder, delay or defraud. An intent to defraud can be established by circumstantial evidence or from inferences drawn from a debtor's course of conduct. See id. at 450. Courts have considered several factors in determining whether a debtor acted with actual intent to hinder, delay or defraud: (1) lack or inadequacy of consideration; (2) family, friendship or other close relationship between the transferor and transferee; (3) retention of possession, benefit or use of the property in question; (4) financial condition of the transferor prior to and after the

7

AO 72A
(Rev.8/82)

transaction; (5) conveyance of all of the debtor's property; (6) secrecy of the conveyance; (7) existence of trust or trust relationship; (8) existence or cumulative effect of pattern or series of transactions or course of conduct after the pendency or threat of suit; (9) instrument affecting the transfer suspiciously states it is bona fide; (10) debtor makes voluntary gift to family member; and (11) general chronology of events and transactions under inquiry. Riley v. Riley (In re Riley), 305 B.R. 873, 878-79 (Bankr. W.D. Mo. 2004). Regardless when he sold the horses, the Debtor used the proceeds of the sale to continue operating his business, and although circumstantial evidence can establish an intent to defraud, Legendary Loan Link did not offer evidence as to either the existence of any of the factors listed above or any other circumstantial evidence to support its claim. For these reasons, section 727(a)(2) cannot serve as a basis for denial of discharge in the case.

2. Section 727(a)(5)

Legendary Loan Link argues the Debtor should be denied a discharge pursuant to 11 U.S.C. § 727(a)(5) because the Debtor failed to explain the conversion of assets and disposition of the proceeds.

Section 727(a)(5) of the Bankruptcy Code denies a debtor a discharge if he or she has failed to explain satisfactorily any loss or deficiency of assets to meet his or her liabilities. Section 727(a)(5) does not contain an intent element as part of its proof, and what constitutes a "satisfactory" explanation is left to the discretion of the Court. Riley, 305 B.R. at 885.

The assertion by Legendary Loan Link that the Debtor should be denied a discharge because of his failure to explain satisfactorily any loss or deficiency of assets cannot succeed. In this case, the Debtor satisfactorily explained that he sold the horses and used the proceeds

8

to continue operating his business. Legendary Loan Link did not prove the Debtor owned any assets that were inexplicably missing, and it therefore has failed to meet its burden of proof.

B.    11 U.S.C. § 523(a)

The statutory exceptions to discharge in bankruptcy are narrowly construed to effectuate the fresh start policy of the Bankruptcy Code. Owens v. Miller (In re Miller), 276 F.3d 424 (8th Cir. 2002). Accordingly, a creditor opposing discharge of a debt must prove the debt falls within an exception to discharge. Werner v. Hofmann, 5 F.3d 1170, 1172 (8th Cir. 1993). The standard of proof for exceptions to discharge under 11 U.S.C. § 523(a) is the preponderance of the evidence. Grogan v. Garner, 498 U.S. 279, 286 (1991).

Here, the outcome of the dischargeability issue requires a determination of whether the debt owed to Legendary Loan Link by the Debtor was "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by . . . a false representation," 11 U.S.C. § 523(a)(2)(A), "for fraud or defalcation while acting in a fiduciary capacity," 11 U.S.C. § 523(a)(4), or "for willful and malicious injury by the debtor to another entity or to the property of another entity," 11 U.S.C. § 523(a)(6). If Legendary Loan Link proves any of these exceptions exist, the debt is nondischargeable.

1. Section 523(a)(2): FALSE REPRESENTATION

Legendary Loan Link argues the Debtor's obligation is nondischargeable pursuant to 11 U.S.C. § 523(a)(2) because the Debtor's execution of the security agreement and letter of understanding and subsequent failure to comply with their terms constitutes a false representation.

9

AO 72A
(Rev.8/82)

A debt for money, property, services, or an extension, renewal, or refinancing of credit, is nondischargeable to the extent that the debtor procured such items by false pretenses, a false representation, or actual fraud. 11 U.S.C. § 523(a)(2)(A). To establish nondischargeability under section 523(a)(2)(A), the following elements must be proved:

(1) the debtor made a representation;
(2) the debtor knew the representation was false at the time it was made;
(3) the representation was deliberately made for the purpose of deceiving the creditor;
(4) the creditor justifiably relied on the representation; and
(5) the creditor sustained the alleged loss as the proximate result of the representation having been made.

Burt v. Maurer (In re Maurer), 256 B.R. 495, 500 (B.A.P. 8th Cir. 2000); Simek v. Erdman, (In re Erdman) 236 B.R. 904, 910 (Bankr. D.N.D. 1999). In assessing a debtor's knowledge of the falsity of the representation, the court must consider the knowledge and experience of the debtor. The Merchants Nat'l Bank of Winona v. Moen (In re Moen), 238 B.R. 785, 791 (B.A.P. 8th Cir. 1999) (citing In re Duggan, 169 B.R. 318, 324 (Bankr. E.D.N.Y. 1994)). A false representation made under circumstances where a debtor should have known of the falsity is one made with reckless disregard for the truth and satisfies the knowledge requirement. Id.

The intent element of section 523(a)(2)(A) does not require a finding of malevolence or personal ill will; all it requires is a showing of an intent to induce the creditor to rely and act on the misrepresentations in question. In re Moen, 238 B.R. at 791. Because direct proof of intent is nearly impossible to discern, a creditor may present evidence of the surrounding circumstances from which intent may be inferred. Id.

In this case, the Debtor made the representation that he would comply with the terms of the security agreement and letter of understanding. The Debtor testified that on July 19,

10

AO 72A
(Rev.8/82)

2002, he was in financial trouble and only had $500.00 and one horse to his name. Notwithstanding that the Debtor is a young man with limited experience and education, he knew or at least should have known of the falsity of his representation to maintain $7,000.00 in collateral given that it was false at the time. More problematic for Legendary Loan Link, however, is establishing that the Debtor deliberately misrepresented the extent of his assets pledged as collateral for the purpose of deceiving Legendary Loan Link. In fact, the Debtor's testimony suggests that he misrepresented his assets because Thovson made clear to him only after the Debtor traveled a significant distance to meet with Thovson about leasing the trailer, fencing panels and gates that he was required to sign the loan documents before Thovson would lease to him. Legendary Loan Link did not offer any evidence of surrounding circumstances from which the Debtor's intent to deceive may be inferred, and the Court therefore concludes Legendary Loan Link has failed to carry its burden of proving the Debtor's representation was deliberately made for the purpose of deceiving it, and Legendary Loan Link's claim under section 523(a)(2)(A) therefore fails.

2. Section 523(a)(4): FIDUCIARY CAPACITY

Legendary Loan Link argues the Debtor's obligation is nondischargeable pursuant to 11 U.S.C. § 523(a)(4) because the Debtor deliberately disposed of the collateral and converted the proceeds while acting in a fiduciary capacity.

The Bankruptcy Code provides that an individual debtor in a Chapter 7 case is not discharged from any debt "for fraud or defalcation while acting in a fiduciary capacity[.]" 11 U.S.C. § 523(a)(4). To prevent the discharge of the Debtor's debt under section 523(a)(4), it is incumbent upon Legendary Loan Link to establish the following two elements: (1) a fiduciary

11

AO 72A
(Rev.8/82)

relationship existed between the Debtor and Legendary Loan Link; and (2) the Debtor committed fraud or defalcation in the course of that fiduciary relationship. Jafarpour v. Shahrokhi (In re Shahrokhi), 266 B.R. 702, 707 (B.A.P. 8th Cir. 2001).

Whether a relationship is a fiduciary relationship within the meaning of section 523(a)(4) is a question of federal law. Id. The fiduciary relationship must arise from an express or technical trust, and therefore, the fiduciary relationship required under section 523(a)(4) is more narrowly defined than that under the general common law. Id. As a result, the broad, general definition of fiduciary—a relationship involving confidence, trust and good faith—is inapplicable. Id. A merely contractual relationship is less than what is required to establish the existence of a fiduciary relationship. Werner v. Hofmann, 5 F.3d 1170, 1172 (8th Cir. 1993) (per curiam). In the instant case, neither the security agreement nor the letter of understanding imposed an express or technical trust. The Debtor was not acting in a fiduciary capacity toward Legendary Loan Link; rather, the relationship between the Debtor and Legendary Loan Link was merely contractual. As such, Legendary Loan Link has failed to establish the first element of "fraud or defalcation while acting in a fiduciary capacity" under section 523(a)(4).

3. Section 523(a)(6): WILLFUL AND MALICIOUS INJURY

Legendary Loan Link argues the Debtor's obligation is nondischargeable pursuant to 11 U.S.C. § 523(a)(6) because the Debtor willfully and maliciously injured Legendary Loan Link by selling the horses collateralizing the loan and failing to surrender the proceeds.

The Bankruptcy Code provides that an individual debtor in a Chapter 7 case is not discharged from any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6). In this context, the term willful means

12

deliberate or intentional. Kawaauhau v. Geiger, 523 U.S. 57, 61 (1998); Hobson Mould Works, Inc. v. Madsen (In re Madsen), 195 F.3d 988, 989 (8th Cir. 1999). The injury, and not merely the act leading to the injury, must be deliberate or intentional. Geiger, 523 U.S. at 61- 62. Malice requires conduct which is targeted at the creditor, at least in the sense that the conduct is certain or almost certain to cause financial harm. Madsen, 195 F.3d at 989. Malice requires conduct more culpable than that which is in reckless disregard of the creditor's economic interests and expectancies. Barclays Amer./Bus. Credit, Inc. v. Long (In re Long), 774 F.2d 875, 881 (8th Cir.1985). The debtor's knowledge that he or she is violating the creditor's legal rights is insufficient to establish malice absent some additional aggravated circumstances. Johnson v. Logue (In re Logue), 294 B.R. 59, 63 (B.A.P. 8th Cir. 2003). Conduct which is certain or almost certain to cause financial harm to the creditor is required. Id.

As discussed above, Legendary Loan Link did not prove the Debtor sold any horses after July 19, 2002. The Court therefore is not convinced the Debtor willfully injured Legendary Loan Link by selling any horses collateralizing the loan without surrendering the proceeds to Legendary Loan Link. Moreover, even if he had sold horses without turning over the proceeds to Legendary Loan Link, even a willful breach is not enough to establish malice in the context of the breach of a security agreement:

> Debtors who willfully break security agreements are testing the outer bounds of their right to a fresh start, but unless they act with malice by intending or fully expecting to harm the economic interests of the creditor, such a breach of contract does not, in and of itself, preclude a discharge.

Long, 774 F.2d at 882. A debtor's retention of the proceeds of sales of collateral, while clearly a breach of a security agreement, is not enough to establish malice. Logue, 294 B.R. at 63.

13

When a debtor has used the proceeds in an attempt, albeit unsuccessful, to keep a business afloat, malice may not necessarily be inferred from the debtor's conduct. First Nat'l Bank of Fayetteville, Ark. v. Phillips (In re Phillips), 882 F.2d 302, 305 (8th Cir. 1989); Long, 774 F.2d at 882. Indeed, the Debtor testified that he used the proceeds of the horse sales to continue operating his business. Legendary Loan Link's claim under 523(a)(6) fails.

Based on the foregoing, the Complaint of Plaintiff Legendary Loan Link, LLP based upon sections 548 and 727 of the Bankruptcy Code is DISMISSED.

**SO ORDERED.**

**JUDGMENT MAY BE ENTERED ACCORDINGLY.**

Dated this June  21 , 2004.

WILLIAM A. HILL, JUDGE
U.S. BANKRUPTCY COURT

Notice of Entry
Under F.R.B.P 9022 (a)
FILED

JUN 21 2004

Clerk
U.S. Bankruptcy Court
District of North Dakota

```
Entered on docket & copies mailed 06/21/04 to:
U.S. Trustee
Michael Wagner, Trustee, Bismarck, ND
Jeremy Holmes, Fargo, ND
Dennis Lindquist, Mandan, ND
Kelly Glatt, Defendant
```

14

AO 72A
(Rev.8/82)